IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:14-CR-268-FL-1

UNITED STATES OF AMERICA    )
    )
v.    )    **MEMORANDUM AND**
    )    **RECOMMENDATION**
ANDREW J. ITTENBACH,    )
    )
    Defendant.    )

This case comes before the court on defendant's motion to suppress ("Mot.") (D.E. 22). The motion was referred to the undersigned for an evidentiary hearing and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 2d public D.E. dated 4 Mar. 2015). On 15 April 2015, an evidentiary hearing was conducted on the motion. (D.E. 29). The motion has been fully briefed and is ripe for ruling.[1] For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

On 6 November 2014, defendant was charged by criminal complaint (D.E. 1) with possession of a firearm and ammunition by a convicted felon on 4 November 2014 in violation of 18 U.S.C. § 922(g)(1). On 12 November 2014, a grand jury returned an indictment (D.E. 10) charging defendant with two counts of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count 1 alleges that defendant possessed a Bushmaster Carbine 15 assault-style rifle ("the assault rifle") and approximately 211

---

[1] Defendant did not file a separate memorandum supporting his motion, but rather incorporated a memorandum into the motion, which was accompanied by two exhibits (D.E. 22-1, 22-2). The government filed a response (D.E. 26) in opposition. Defendant filed a supplemental memorandum after the evidentiary hearing (D.E. 33) as authorized by the court. (*See* Minute Entry text at D.E. 29). The government filed a notice (D.E. 32) indicating that it was electing not to file a supplemental brief.

rounds of .223 caliber ammunition (Indict. 1), and Count 2 alleges that he possessed a Mossberg 12-gauge shotgun and approximately 5 rounds of Remington .00 buckshot (*id.* at 1-2).

On 13 February 2015, defendant filed the instant motion seeking suppression of all evidence taken during the search of a vehicle in which he was a passenger, all post-arrest statements he made to law enforcement, and all evidence seized during a subsequent search of his home. At the evidentiary hearing on the motion on 15 April 2015, the government presented the testimony of Special Agent Craig Noyes ("Agent Noyes") with the Federal Bureau of Investigation ("FBI"), and two troopers with the North Carolina State Highway Patrol ("NCSHP") who were involved in the events in question: Trooper John Lamm ("Trooper Lamm") and Trooper Jack Clark ("Trooper Clark"), who is assigned as a task force officer with the FBI. (Transcript of Hearing ("Tr.") (D.E. 31) 7:24 to 8:2; 71:19 to 73:7; 106:6-25; 107:1-11).

The court admitted seven exhibits (*see* Hrg. Ex. List (D.E. 30)) offered by the government, without objection by defendant, as follows: (a) Facebook[2] messages between an FBI confidential human source ("CHS") and defendant (Gov. Ex. 1 (D.E. 30-1); Tr. 11:10-12:16); (b) an FBI report of phone text messages between the CHS and defendant (Gov. Ex. 2 (D.E. 30-2); Tr. 22:12 to 23:15); (c) photographs of items seized during the traffic stop (Gov. Exs. 3 (D.E. 30-6), 5 (D.E. 30-8), 6 (D.E. 30-9); Tr. 84:14-22; 116:9-10; 129:22 to 130:6); (d) a video recording of the traffic stop ("Video")[3] (Gov. Ex. 4; Tr. 85:5 to 86:24); and (e) a screenshot of a phone text message from defendant to the CHS (Gov. Ex. 7 (D.E. 30-3); Tr. 29:12 to 30:8).

---

[2] Facebook is a social media website. (Tr. 9:9-13).

[3] All citations herein to the Video are to the time stamp in minutes and seconds (*e.g.*, "00:00") appearing in the video image file.

The court also admitted seven exhibits offered by the defendant, without objection by the government, as follows: (a) the transcript of Agent Noyes's testimony at defendant's 13 November 2014 detention hearing in this case (Def. Ex. A (filed at D.E. 19); Tr. 131:1-132:8); (b) handwritten notes of United States Secret Service Special Agent Craig Korcz ("Agent Korcz") (Def. Ex. D (D.E. 30-5); Tr. 66:17-22; 68:15-19); (c) the report of Trooper Lamm ("Lamm Rep.") (Def. Ex. G (D.E. 30-7; also filed as Ex. 1 to Mot. at D.E. 22-1)); (d) screenshots of phone text messages exchanged by defendant and the CHS (Def. Ex. T (D.E. 30-4); Tr. 53:20 to 54:5; 60:16-20); Tr. 90:17-23; 131:17 to 132:8); (e) Canine Arrest and Utilization Report (Def. Ex. U (D.E. 30-11); Tr. 130:9-18; 131:17 to 132:8); (f) a Canine Training Log (Def. Ex. V (D.E. 30-10); Tr. 130:9-18; 131:17 to 132:8); and (g) a report by Agent Noyes on the interview of defendant and search of his house ("Inter. Rep.") (Def. Ex. 2 (filed as Ex. 2 to Mot. at D.E. 22-2); Tr. 131:17 to 132:8).

## **FINDINGS OF FACT**

After careful consideration of the evidence of record, the court makes the following findings of fact[4] material to the relevant legal issues:

## I.      THE FBI INVESTIGATION OF DEFENDANT

In April 2014, the FBI[5] initiated an investigation of defendant as a result of information provided from a CHS who operates a public page on Facebook called "North Carolina Ghost Militia," a right-wing militia extremist organization. (Tr. 8:16 to 9:24; 46:25 to 47:2). Through

---

[4] The evidence regarding the events that occurred during the traffic stop consists of the hearing testimony of Troopers Lamm and Clark, the Lamm report, and the Video. While there are minor inconsistencies between the Video and the other evidence, such inconsistencies are not material and appear to be the result of routine deterioration in Trooper Lamm's and Clark's recall of details due to the passage of time.

[5] The involvement of the U.S. Secret Service in the investigation through Agent Korcz was to rule out whether defendant was a threat to a United States Protectee or Official. (Tr. 45:6 to 46:8).

this Facebook page, the CHS interacted with individuals that were interested in the group's ideology. (Tr. 9:21-24).

On 22 April 2014, defendant contacted the CHS by leaving a post on the public Facebook page, and the CHS responded to defendant using Facebook's private instant message feature. (Tr. 10:18 to 22; Gov. Ex. 1 at 1). The CHS and defendant then proceeded to have a conversation through Facebook private instant messaging. (Gov. Ex. 1 at 1-3). Defendant explained to the CHS that he was an anti-government computer hacker associated with a group known as "Anon," short for "Anonymous," which is known for conducting cyber attacks. (Tr. 14:4-23; Gov. Ex. 1 at 1). He described himself to the CHS as an "anarcho-socialist." (Gov. Ex. 1 at 1). He further explained:

> We do not need a "boss" to rule us, but we MUST rule, and discipline, ourselves. We should care for our neighbors & community, locally AND globally, and take care not to place our own interests over common ones, as common interest IS our own best interest. We all share this rocky island in a sea of stars, ownership is equal to all, as is responsibility. Unfortunately, these days, the interests of an elite few supercede common interest, though it is sold to us in the media AS common interest. (Ex: The "Wars" on Drugs & "Terror", are WARS ON THE PEOPLE, and the aggressors are the biggest drug pushers & terrorists in the world.)

(*Id*.). Defendant continued:

> As for Anon, don't get too excited. I am a DDoSer, meaning I use pre-programmed means to shutdown sites & pages, but my actual "hacking" (system takeovers & defacements) skills are limited. I do, however, "know" a lot of those guys. Additionally, like Barrett Brown, I quit using aliases and instead announce my affiliation un-anonymously because we can't ALL be faceless. The enemy wears masks, too. Sometimes we have to take the mask off to remid [sic] the people that under it, is another guy like you. Further, while I do still participate in "ops", I diverge from the "party line" in that *I am not a strict adherent to the principles of nonviolence*, for reasons previously stated. I am not the only one . . .

(*Id*. (emphasis added)).

During the same conversation, defendant indicated that he owned a firearm. The CHS stated, "We all will accept Anon to join our brothers if they desire to[.] We are the fighters yall

are the computer wizards. I have AAS computer science but that was 1991." (*Id*. at 3). Defendant responded, "I fight, too. Bushmaster C15 (M4 Variant)[6] & modified, personally." (*Id*.). Defendant also indicated that he had a felony conviction which precluded him from owning a weapon in North Carolina, stating:

> Do you have any guys out this way I could coordinate/train with? Don't have to tell me who they are, tell them who I am & they can decide whether or not they are interested. This area is surprisingly un-friendly, mostly due to ignorance. *Preferably no law enforcement guys*, even Oath Keepers, *as my gun rights ARE my natural rights, but according to the state (due to past "transgression") I don't have any such right, and that may create a conflict of interest, for me to be armed in their presence.*

(*Id*. (emphasis added)). Upon receipt of this information from the CHS, the FBI conducted a criminal records search, which disclosed that defendant, as he indicated, was a convicted felon. (Tr. 16:21 to 17:2). Specifically, defendant was found to have the following three prior state felony convictions: (1) a 1992 conviction for breaking and entering a motor vehicle; (2) a 1996 conviction for indecent liberties with a minor; and (3) a 2000 conviction for failing to register as a sex offender. (Def. Ex. A 6:15-24).

In an instant message conversation on 24 April 2014, defendant further referenced the firearm he owned, stating, "getting a firearm pistol grip for my M4 this weekend, kinda excited . . . when i get my new laser, she'll be fully decked out." (Gov. Ex. 1 at 4). Defendant further explained that he had named the firearm "Sura," in reference to the wife of Spartacus, "because she is 'Sura' to get the job done . . . lol." (*Id*.). He also stated that "[he] would like to eventually pickup a sniper-ish platform, but opted for M$[7] as primary wepsys." (*Id*.).

---

[6] The firearm referenced by defendant is "an assault style rifle, Carbon 15, manufactured by Bushmaster, that is magazine fed and loaded and utilizes a 5.56 or a 2.23 round." (Tr. 15:19-25).

[7] "M$" is probably intended to be "M4."

In an instant message conversation on 27 April 2014, defendant indicated to the CHS that he had used the firearm. (Tr. 19:11-21). The CHS told defendant that he was "[t]hinking about a colt M4," and asked defendant, "How does the Bushmaster fire? Is it smooth?" (*Id*. at 6). Defendant responded, "Relatively smooth. No aftermarket trigger work needed. Not smoothest I ever squeezed, but is better than satisfactory. Going to get fore pistol grip today. That should make it perfect, as far as handling/firing. I definitely am pleased with it overall." (*Id*.). He also stated that he had "put it thru some torture tests, with no issue." (*Id*.).

Defendant also communicated to the CHS that his purpose for having the firearm was that he was on an "offensive mission." (Tr. 20:1-7). Specifically, Agent Noyes testified that defendant "was looking for [close quarter battle] training" and "envisioned a house-to-house, building-to-building type assault" and stated that "he could kill more people that way than hiding out." (Tr. 20:7-10). The targets of this offensive were the wealthy top 1% of the population. (Tr. 20:11-14).

Following the initial conversations via Facebook private instant messaging, the CHS continued to communicate with defendant via Facebook, as well as by phone calls, phone text messages, and face-to-face meetings. (Tr. 19:2-10). On 27 October 2014, defendant invited the CHS to travel with him to Washington, D.C. ("D.C.") to participate in a protest event being held there on 5 November 2014. (Tr. 21:11-15; Gov. Ex. 2 at 1). The event, called the "Million Mask March," is an annual event sponsored by Anonymous. (Def. Ex. A 7:17-23).

During a 2 November 2014 recorded phone conversation with the CHS, in which they were discussing the proposed trip, defendant indicated that he would be bringing a firearm with him, stating that he was "going prepared for whatever might happen," and that he was going "fully equipped." (Tr. 21:15-24; 25:7-15). On 3 November 2014, defendant sent a phone text

message to the CHS noting that they may be taking others to D.C. and that "[w]e're taking tools as well." (Gov. Ex. 2 at 2). From his interaction with defendant, the CHS understood being "equipped" and having "tools" as referencing carrying firearms. (Tr. 25:18-21; 26:14-19). Using the name "Sura" that defendant had previously used to reference his firearm, the CHS responded by text, "will b packing my toys so hope sura is with u so the[y] wont be lonely lol." (Gov. Ex. 2 at 2; Tr. 26:19 to 27:7). Defendant responded by text, "she will be along," indicating that he would be bringing his assault rifle to D.C. (Gov. Ex. 2 at 2; Tr. 26:24 to 27:6). Defendant asked the CHS if he would carry defendant's firearm in his vehicle for the trip, stating "Uncle dont like me & we cant be seen together." (Gov. Ex. 2 at 2).

## II.      THE FBI REQUEST FOR ASSISTANCE FROM NCSHP

Based on the information about the D.C. trip received from the CHS during the 2 November 2014 recorded phone conversation, Agent Noyes met with and informed Trooper Clark on 3 November 2014 that defendant would be traveling to D.C. with an assault rifle and that he was a convicted felon. (Tr. 32:9-17; 33:22 to 34:4; 107:18 to 108:8). Agent Noyes asked Trooper Clark if the NCSHP could assist the FBI in conducting a traffic stop of the vehicle in which defendant was traveling prior to its arrival in D.C. (Tr. 107:24 to 108:2). Agent Noyes also expressed to Trooper Clark concerns about revealing the identity of the CHS if the stop was based overtly on defendant's possession of a firearm. (Tr. 33:12-21; 109:13-22). Trooper Clark agreed that the NCSHP would attempt to stop the vehicle based on a motor vehicle violation so as not to implicate the CHS. (Tr. 109:24 to 110:2). Trooper Clark also asked Agent Noyes if there was a possibility that defendant might be traveling with drugs, and Agent Noyes responded that this was a possibility because the CHS had witnessed defendant's involvement in a small marijuana deal in August of that year. (Tr. 33:2-7). Trooper Clark suggested that the traffic stop

be conducted with a narcotics detection canine to further shield the fact that the true purpose of the stop was to search for firearms. (Tr. 33:8-11). Following his meeting with Agent Noyes, Trooper Clark contacted the NCSHP Criminal Interdiction Unit to request assistance in performing the requested traffic stop. (Tr. 110:5-7).

## III.    SURVEILLANCE OF DEFENDANT ON 4 NOVEMBER 2014

On the morning of 4 November 2014, Agent Noyes and Agent Korcz traveled to Plymouth, North Carolina to set up loose surveillance of defendant's home, during which they drove by defendant's home approximately once per hour. (Tr. 34:9-16). Throughout the day, Agent Noyes was in contact with the CHS, who was communicating with defendant via text message. (Tr. 35:20 to 36:1; *see also* Gov. Ex. 2 at 2-3). The CHS relayed the information he received from defendant to Agent Noyes, who then passed it along to Troopers Clark and Lamm. (Tr. 36:21 to 37:5).

At approximately 1:50 p.m., Agent Korcz observed defendant leaving his neighborhood in his vehicle. (Tr. 35:6-9). While Agent Korcz lost visual contact with defendant's vehicle, he and Agent Noyes had been informed by the CHS that arrangements had been made for the CHS to meet defendant in Rocky Mount, North Carolina. (Tr. 35:15-23). Specifically, the CHS and defendant agreed that they would meet later that afternoon in Rocky Mount and then travel the remainder of the way to D.C. together, but in separate vehicles. (Gov. Ex. 2 at 2-3). They decided to meet in a specific parking lot behind a restaurant to transfer defendant's firearm to the CHS's vehicle. (*Id*.). Defendant informed the CHS of the approximate time he would be arriving at the designated location and that he would be riding with a friend in a burgundy Grand Marquis ("Grand Marquis"). (*Id*. at 3). However, after defendant arrived at the agreed location, the CHS informed defendant via text message that he would be unable to meet defendant at that

time because he had to make new arrangements for someone to keep his young daughter while he was away. (*Id*. at 3-4). He stated that instead he would meet defendant at the hotel in Virginia the following morning. (*Id*. at 4).

Agent Noyes reinitiated surveillance of defendant after he arrived in the Grand Marquis at the designated meeting location in Rocky Mount. (Tr. 39:15-18). Agent Noyes observed defendant depart from the parking lot in Rocky Mount and head west on Highway 64. (Tr. 39:19-20). Agent Noyes, who was communicating with Trooper Clark by cell phone, followed defendant and notified Trooper Clark of defendant's departure and direction of travel. (Tr. 17-25). Troopers Lamm and Clark had positioned themselves nearby in a patrol car along Highway 64 with Trooper Lamm driving. (Tr. 39:20-23; 73:16-20; 110:8-19; Lamm Rep. 1; Def. Ex. G at 1). Waiting with them at this location, but in a separate vehicle, was NCSHP Sergeant David L. Hawkins ("Sergeant Hawkins"). (Lamm Rep. 1).

## IV.    THE TRAFFIC STOP

After receiving the information from Agent Noyes, Troopers Lamm and Clark observed the Grand Marquis traveling on Highway 64 and initiated pursuit of the vehicle. (Tr. 75:15-18; Lamm Rep. 1; Video 00:15-01:00). Agent Noyes, who was still following defendant, observed the Troopers pull behind the Grand Marquis. (Tr. 39:22-25; Lamm Rep. 1; Video 01:00-01:15). Agent Noyes then pulled into the passing lane and drove past the Grand Marquis and the Troopers. (Tr. 39:22-25). Trooper Lamm then witnessed the Grand Marquis travelling too closely behind a trailer being pulled by a truck and initiated a traffic stop. (Tr. 75:15-21; 92:17 to 93:7; Lamm Rep. 1; Video 02:00-02:20). Sergeant Hawkins stopped his own vehicle behind Trooper Lamm's. (Tr. 81:7-8; 124:11-24; Lamm Rep. 1).

After pulling the Grand Marquis over, Trooper Lamm did not approach the vehicle because of the possibility that the occupants were carrying a firearm. (Tr. 75:22 to 76:2; 93:8-13; 112:10-19; Lamm Rep. 1; Video 02:30-02:40). Rather, he motioned for the driver, later identified as Randy Jett ("Jett") (Tr. 78:1-2; 93:8-13; 112:19-20; Lamm Rep. 1; Video 05:30-05:45), to come back to the patrol car, and Jett complied (Tr. 76:2-6; Video 02:30-02:50). Trooper Lamm first asked Jett whether he had any weapons on him, and Jett stated that he had a pocket knife and a taser. (Tr. 76:14-16; 93:19-19; Lamm Rep. 1; Video 02:50-03:25). Jett consented to Trooper Lamm's request to pat him down and remove the weapons. (Tr. 76:16-19; 93:19-20; Lamm Rep. 1; Video 03:10-03:30). During the pat-down, Trooper Lamm felt a hard object in Jett's pocket. (Tr. 76:20-21; Video 03:35-03:55). Jett stated that it was a bolt for his boat. (Tr. 76:22-23; Lamm Rep. 1; Video 03:40-03:50). Trooper Lamm placed the objects he removed from Jett's pockets on the hood of Sergeant Hawkins's patrol car. (Tr. 93:16-25; Lamm Rep. 1). While Lamm was engaged with Jett, Sergeant Hawkins examined the items. (Tr. 80:20 to 81:16; Lamm Rep. 1).

Trooper Lamm and Jett then got into the front seat of the patrol car, and Trooper Lamm began processing the traffic violation and explained to Jett why he had been stopped. (Tr. 77:10-19; Lamm Rep. 1; Video 05:10-05:20). Jett admitted that he had been following another vehicle too closely. (Tr. 77:20; 94:25 to 95:2; Lamm Rep. 1; Video 08:05-08:20). Trooper Lamm told defendant that if his license and registration were okay, he would receive a warning ticket and then be allowed to leave. (Tr. 77:21-23; Lamm Rep. 1; Video 08:00-08:10). Jett identified the passenger, defendant, as his friend and stated that they were traveling to D.C. to participate in a protest march. (Tr. 80:3-5; Lamm Rep. 1; Video 11:08-11:40).

While Trooper Lamm was conducting the traffic enforcement portion of the stop with Jett, Trooper Clark approached the Grand Marquis and spoke with defendant. (Tr. 94:9-21; 112:24 to 113:3; 114:9-15; Video 03:20-03:35). Trooper Clark asked defendant to step out of the vehicle. (Tr. 114:19-20; Video 03:45-04:00). As defendant did so, Trooper Clark observed a long-bladed knife in a cargo pocket of defendant's pants. (Tr. 114:20-22; Video 04:00-04:10). Trooper Clark removed the knife and placed it on the driver's seat of the vehicle. (Tr. 114:22-24; Video 04:00-04:10). During the conversation that ensued, defendant informed Trooper Clark that he had marijuana in his pocket, and he then provided it to Trooper Clark. (Tr. 115:23 to 116:4; Lamm Rep. 2; Gov. Ex. 3; Video 04:10-04:45). Trooper Clark also obtained a North Carolina Driver's License from defendant, which identified him as Andrew Ittenbach. (Tr. 114:15-16; Video 06:10-06:20). During his interactions with defendant, Trooper Clark observed that defendant appeared very nervous, noticing specifically that his pulse was pounding heavily in his neck. (Tr. 115:11-13).

The traffic enforcement portion of the stop lasted approximately 10 minutes. (*See* Video 2:05 (activation of patrol car lights initiating the stop) to 12:47 (Jett's receipt of the warning ticket from Trooper Lamm)).[8] After Trooper Lamm handed him the warning ticket, Jett opened the door of the patrol car to exit. (Tr. 78:18-22; Lamm Rep. 1; Video 12:10-12:50). However, before Jett exited, Trooper Lamm informed him that the traffic stop was complete, but then stated, "I have a few more questions I'd like to ask you, if that's okay with you." (Tr. 78:23-24; Lamm Rep. 1; Video 12:47-12:53). Jett agreed and closed the patrol car door. (Tr. 78:24-25; Lamm Rep. 1; Video 12:50-12:55).

---

[8] Defendant concedes that the traffic stop ended at the time that Trooper Lamm issued Jett the written warning for following another vehicle too closely. (Supp. Mem. 4).

Trooper Lamm then asked Jett if he had any illegal items in the car, reviewing a specific list of such items.  (Tr. 78:25 to 79:2; Lamm Rep. 1; Video 13:00-13:48).  In response to Trooper Lamm's question about whether Jett had any marijuana, Jett told Trooper Lamm that he had smoked marijuana, but that he did not have any on him.  (Tr. 79:1-5; Lamm Rep. 1; Video 13:27-13:34).  But Jett also stated that defendant might possibly have marijuana.  (Tr. 79:3-4; Lamm Rep. 1; Video 13:00-13:12).  When Trooper Lamm asked Jett if there were any weapons in the car, Jett stated that there were not, but Trooper Lamm observed that Jett's behavior during this response was different from his responses to questions about other items.  (Tr. 79:5-9; Lamm Rep. 1; Video 13:30-13:45).  Unlike the other responses, during which Jett maintained direct eye contact with Trooper Lamm, he broke eye contact and looked directly at the Grand Marquis before responding that there were no weapons.  (Tr. 79:6-18; Lamm Rep. 1-2).  Trooper Lamm then asked Jett for permission to search the vehicle, and Jett refused to consent.  (Tr. 79:21-22; 80:10-12; 96:6-9; Lamm Rep. 2; Video 13:48-13:59).  Trooper Lamm informed Jett that he had a narcotics detection canine with him and that he was going to conduct an exterior sniff of the vehicle.  (Tr. 80:14-15; Lamm Rep. 2; Video 15:02-16:06).

Trooper Lamm then exited the patrol car and spoke with Sergeant Hawkins.  (Tr. 80:19 to 81:16; Video 16:18-16:22).  Sergeant Hawkins informed Trooper Lamm that the bolt removed from Jett's pocket was actually a marijuana pipe and contained marijuana residue.  (Tr. 80:19 to 81:3; Lamm Rep. 1; Video 16:20-16:45).  Trooper Lamm then spoke with Trooper Clark, who informed Trooper Lamm that defendant was in possession of a small amount of marijuana.  (Tr. 117:1-13; Video 16:45-17:10).  Just prior to beginning the exterior sniff of the vehicle, Jett admitted to Trooper Lamm that the bolt was a marijuana pipe.  (Video 18:33-18:45).

Trooper Lamm then conducted the exterior sniff of the vehicle with the narcotics detection canine, and the canine alerted to the presence of drugs. (Tr. 82:6 to 83:21; Lamm Rep. 2; Video 19:20-19:50). Troopers Lamm and Clark then conducted a search of the vehicle. (Tr. 83:25 to 84:1; Video 20:30-38:05). When they searched the trunk, they found marijuana, marijuana smoking pipes, and a black weapons case containing the assault rifle and ammunition. (Tr. 84:2-22; 117:17 to 120:11; Lamm Rep. 2; Gov. Exs. 3, 5, 6). During the search, Jett indicated to Troopers Lamm and Clark that the weapon and ammunition belonged to defendant. (Tr. 120:21 to 121:21; Lamm Rep. 2; Video 25:15-25:30).

## V. INTERVIEW OF DEFENDANT AND CONSENT TO SEARCH HIS HOME

Defendant and Jett were taken into custody and transferred to the Nash County Sheriff's Office. (Tr. 40:1-5;121:22-25; Lamm Rep. 2). Defendant was interviewed by Agent Noyes, Agent Korcz, and NCSHP FBI Task Force Officer Chad Lloyd. (Tr. 40:6-9; 42:16-19; Inter. Rep. 1). Prior to any questioning, both Agent Noyes and Agent Korcz (collectively, "the Agents"[9]) provided separate *Miranda* warnings to defendant. (Tr. 40:10-12; 43:7-12; Inter. Rep. 1, 2). Defendant chose to waive his rights and to be interviewed without an attorney present. (Tr. 40:13-20; Inter. Rep. 1, 2).

During the interview, defendant admitted that he had enlisted a friend to purchase the assault rifle and ammunition for him. (Tr. 40:21 to 42:17). The information regarding this purchase was consistent with the information defendant had provided to the CHS in Facebook messages, which had been provided to the FBI during its investigation. (Tr. 41:18-25). Defendant also admitted that he had a shotgun in his home and told the Agents that it was located in a golf bag in his living room. (Tr. 42:1-6; Inter. Rep. 1). As a result of this admission, the

---

[9] Where the evidence is not clear as to the respective participation of the two Agents in the interview and subsequent search of defendant's home, the court refers to them collectively.

Agents asked defendant if he would consent to a search of his home. (Tr. 42:7-11). In response to the request, defendant began asking questions about what such a search would entail, including whether he could be present during the search. (Tr. 43:15-22; 44:1-2). Defendant informed the Agents that he had several animals in his home, including 2 snakes, 2 large dogs, and 15 cats, and asked if he could be with them and feed them during the search. (Tr. 44:2-7). He was told that he would be allowed to do that. (Tr. 44:6-9). Defendant then gave his consent to search his home, but refused to consent to an additional request to search his digital media and his phone. (Tr. 44:1-23; Inter. Rep. 1, 3). The search was conducted later that evening, during which the Agents located the subject shotgun and ammunition in the location indicated by defendant. (Tr. 42:11-15; Inter. Rep. 1).

## APPLICABLE LEGAL PRINCIPLES

## I.     THE AUTOMOBILE EXCEPTION TO THE WARRANT REQUIREMENT

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures," U.S. Const. amend. IV., and "generally requires the police to obtain a warrant before conducting a search," *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010). However, the law is long- and well-established that where a law enforcement officer has probable cause to believe that a vehicle contains contraband or evidence of a crime, a warrant is not required to search the vehicle. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) ("As we recognized nearly 75 years ago . . . there is an exception to [the warrant] requirement for searches of vehicles."); *Kelly*, 592 F.3d at 589 ("There is a well-established exception to [the search warrant] requirement . . . for automobile searches." (citing *Carroll v. United States,* 267 U.S. 132 (1925))).  "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."

*Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996) *(per curiam).* "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" *Kelly*, 592 F.3d at 590 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982))); *see also United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) ("Once the officer's suspicions rise to the level of probable cause, they are empowered to search 'the entire vehicle, including the trunk and all containers therein that might contain contraband.'") (quoting *United States v. Bradford,* 423 F.3d 1149, 1160 (10th Cir. 2005))).

"Probable cause exists 'where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Smith*, 456 Fed. Appx. 200, 209-10 (4th Cir. 2011) (quoting *Ornelas v. United States,* 517 U.S. 690, 696 (1996)); *see also United States v. Carico*, 311 Fed. Appx. 572, 574 (4th Cir. 2008) ("The Supreme Court has defined the test for probable cause as 'whether, given all the circumstances, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983))). "[Probable cause] is a 'commonsense' conception that deals with 'the factual and practical considerations of everyday life.'" *Kelly,* 592 F.3d at 592 (quoting *Ornelas,* 517 U.S. at 695).

## II.     THE COLLECTIVE KNOWLEDGE DOCTRINE

Under the collective knowledge doctrine, "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself." *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011). The knowledge of the instructing officer is thereby substituted for the knowledge of the acting officer. *Id.* at 493.   The collective knowledge doctrine is applied in determining whether an

officer had probable cause to conduct a search or make an arrest as well as whether an officer had the reasonable suspicion to justify an investigatory stop and frisk. *See id.* at 491-96 (applying the doctrine in addressing whether an officer had reasonable suspicion to conduct a nonconsensual frisk of defendant); *United States v. Laughman*, 618 F.2d 1067, 1072 (4th Cir. 1980) ("[S]o long as the officer who orders an *arrest or search* has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts." (emphasis added)); *see also, e.g., United States v. Wright*, 374 Fed. Appx. 386, 390 (4th Cir. 2010) (applying the doctrine in addressing whether an officer had probable cause to make an arrest); *United States v. Leak*, No. 3:09-CR-81-W, 2010 WL 1418227, at *7 (W.D.N.C. 5 Apr. 2010) (applying the doctrine in addressing whether an officer had probable cause to search a vehicle), *aff'd,* 464 Fed. Appx. 92 (4th Cir. 2012).

The collective knowledge doctrine does not permit the aggregation of "bits and pieces of information from among myriad officers." *Massenburg*, 654 F.3d at 493. However, when a group of officers in close communication with one another determines that it is proper to take an action based on probable cause, the knowledge of the group that made the determination may be considered in assessing probable cause, not just the knowledge of the individual officer who took the action. *Id.*; *see also Wright*, 374 Fed. Appx. at 390 ("[P]robable cause can rest on the collective knowledge of the officers involved in an operation rather than solely on that of the officer who makes the arrest.").

## III.    INVESTIGATORY TRAFFIC STOPS

While "not all personal intercourse between policemen and citizens involves 'seizures' of persons," when "a police officer accosts an individual and restrains his freedom to walk away, he

has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16 (1968). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30); *see also United States v. Williams*, No. 11-4414, 2011 WL 4866760, at *1 (4th Cir. 14 Oct. 2011). "Investigatory stops are also permissible if the officers act on a reasonable suspicion that the person stopped was involved in a completed crime." *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987).

## ANALYSIS

### I.     LAWFULNESS OF THE VEHICLE SEARCH

In his motion, defendant first argues that the search of the vehicle during which Troopers Lamm and Clark discovered the assault rifle and ammunition was unlawful. The basis for his argument is that Troopers Lamm and Clark did not have reasonable suspicion to justify detaining him beyond the period of time required to conduct the traffic stop and issue Jett a warning ticket for the violation of following another vehicle too closely. While defendant concedes that Jett's traffic violation was legally sufficient—that is, provided reasonable suspicion—to initiate a traffic stop (Mot. 7), he asserts that "[n]othing officers gleaned or witnessed during the routine traffic stop gave authorities any legal basis for their continued detention of the two men" (Mot. 8). Defendant's argument is wholly without merit.

#### A.     Probable Cause to Search for Firearms

In this case, the events that occurred following the initiation of the traffic stop, and more specifically following the conclusion of the traffic enforcement portion of the stop, are not essential to the lawfulness of the vehicle search. The reason is that the information obtained

during the FBI's investigation of defendant that prompted the stop provided the probable cause necessary to stop and search the vehicle for firearms.

As previously discussed, during the course of an investigation lasting more than six months, Agent Noyes received information from the CHS that defendant owned a firearm, had used it, and intended to take it with him to D.C. for a protest march on 5 November 2014. Moreover, this information was in the form of defendant's own statements made in Facebook instant messages, phone text messages, and recorded phone conversations. The FBI also determined through a check of defendant's criminal history that he was a felon. Further, on the day of the traffic stop, Agent Noyes was receiving real-time information from the CHS regarding defendant's travel plans and which indicated that the firearm was in the vehicle in which defendant was traveling. This information gave Agent Noyes probable cause to believe that, at the time that defendant was traveling to D.C., he was in possession of a firearm, which, given his status as felon, constituted a crime. Consequently, the search of the vehicle was lawful.

## B. Application of the Collective Knowledge Doctrine

Defendant contends that regardless of whether Agent Noyes had probable cause to stop and search the vehicle, such probable cause does not support the stop and search by Troopers Lamm and Clark themselves. Although defendant's argument is not altogether clear, he appears to be asserting that the collective knowledge doctrine does not operate in this case because Troopers Lamm and Clark were not acting upon instructions from the FBI. (*See* Supp. Mem. 7). Specifically, defendant contends that Agent Noyes "never gave the state troopers any instructions as to what they were supposed to do with the information being given to them." (*Id*.). In fact, though, the evidence unequivocally demonstrates that Agent Noyes requested that

Troopers Lamm and Clark conduct a traffic stop for the ultimate purpose of locating and seizing the firearm that defendant was taking to D.C. for possible use during a protest march.

Further, defendant's argument appears to misconstrue the collective knowledge doctrine. The key requirement of this doctrine is that "the instructing officer had sufficient information to justify taking such action [himself].'" *United States v. Hands*, 573 Fed. Appx. 278, 279 (4th Cir.) (quoting *Massenburg*, 654 F.3d at 492), *cert. denied*, 135 S. Ct. 385 (2014); *see also United States v. Hooker*, 416 Fed. Appx. 467, 471 (5th Cir. 2011) ("[W]here there was communication between the officer who had the facts giving rise to probable cause and the officer who performed the search, probable cause can be imputed to the searching officer under the collective knowledge doctrine."). The circumstances here fall plainly within the scope of the collective knowledge doctrine. As discussed above, Agent Noyes had knowledge of the facts giving rise to probable cause at the time Troopers Lamm and Clark conducted the stop. In other words, Agent Noyes, himself, would have had a legal basis to stop and search the vehicle for firearms. This probable cause was therefore imputed to the Troopers conducting the stop at Agent Noyes' request. *See United States v. Herevia*, No. CRIM. RDB-13-639, 2014 WL 4784321, at *5 (D. Md. 23 Sept. 2014) (applying the collective knowledge doctrine in holding that the stop and search of defendants' vehicle by a state trooper was lawful where it was performed at the request of DEA agents who had been conducting a lengthy investigation of a cocaine trafficking conspiracy and who, at the time the stop was requested, had reasonable suspicion that the defendants were in the process of transporting narcotics in the vehicle); *see also Hooker*, 416 Fed. Appx. at 472 (stop of a vehicle by police officer was lawful under the collective knowledge doctrine because it was done at the request of DEA agents who had probable cause to believe that defendant was traveling in a car containing a kilogram of cocaine); *Chavez*, 534 F.3d at

1347-48 (holding that the stop and search of a vehicle for drugs by a highway patrolman was lawful where the patrolman "acted on the strength of the DEA's probable cause" even though the DEA task force officer who requested the stop did not communicate to the patrolman "the substance of the DEA's suspicions")  Moreover, Troopers Lamm and Clark were not acting without knowledge of the basic information that supported probable cause to stop and search the Grand Marquis for firearms.  At the time of the traffic stop, Troopers Lamm and Clark knew: the identity of both defendant and the driver; their physical descriptions from their DMV photographs; the description and license plate number of the Grand Marquis; that defendant was traveling to D.C. with a firearm; and that defendant was a convicted felon.  (Tr. 74:3 to 75:11; 88:12-15; 90:24 to 91:10; 110:19 to 111:23; Lamm Rep. 1).  Further, Agent Noyes was in constant contact with Trooper Clark immediately preceding the stop to relay developing information received from the CHS.

In addition, the fact that Troopers Lamm and Clark sought and obtained an independent basis to both stop and, as discussed below, search the vehicle is of no moment.  Courts have concluded that "the application of the collective knowledge doctrine is unaffected by an officer's use of a cover story to disguise a stop as a mere traffic stop."  *United States v. Williams*, 627 F.3d 247, 253-54 (7th Cir. 2010); *see also Chavez,* 534 F.3d at 1348 (applying the collective knowledge doctrine where the officer conducting a stop at the request of another investigating law enforcement agency pretended that the stop was for a traffic violation to conceal a confidential informant's identity); *United States v. Ramirez,* 473 F.3d 1026, 1038 (9th Cir. 2007) (Kozinski, J., concurring) (where there was independent probable cause for a traffic stop, "disguising the stop as a 'traffic stop' was a valid law enforcement tactic calculated to ensure an officer's safety"); *United States v. Bruce*, No. CR-12-2519-TUC-DCB, 2013 WL 6252437, at

*13 (D. Ariz. 4 Dec. 2013) ("That [the officer conducting the traffic stop] was told to develop his own reason to stop the car is irrelevant. Based on the collective knowledge of the agents involved in the on-going investigation he had reasonable suspicion to conduct a legal stop."). As the evidence plainly demonstrates, the stop was performed in this manner both to protect the identity of the CHS and to assure the safety of Troopers being asked to confront an individual believed to be carrying an assault rifle.[10]

### C. Probable Cause to Search for Drugs

Even absent the probable cause developed during the FBI investigation, the evidence clearly shows that Troopers Lamm and Clark developed independent probable cause to search the vehicle for marijuana during the traffic stop. First, Trooper Clark had probable cause to search the vehicle for marijuana approximately two and a half minutes into the stop when he learned that defendant was in possession of marijuana. (Video 4:43-4:46). Trooper Lamm also independently developed probable cause based on Jett's admission that he had smoked marijuana and his possession of the "bolt" that was determined to be a marijuana pipe that contained marijuana residue. *See, e.g., United States v. Ashe*, 521 Fed. Appx. 97, 98 (4th Cir. 2013) ("[O]nce the police officer observed the marijuana residue, the officers had probable cause to believe that the vehicle contained contraband and could search the vehicle without a warrant."); *United States v. Washington*, 439 F. Supp. 2d 589, 598 (E.D. Va. 2006) ("[T]he odor of marijuana *alone* can provide sufficient probable cause to justify a warrantless search of a vehicle and its compartments under the automobile exception." (emphasis added)), *aff'd*, 338 Fed. Appx. 316 (4th Cir. 2009).

---

[10] Inexplicably, defendant ignores this evidence and contends that "the officers' plan on November 4, 2014, i.e. creating a ruse to conduct a traffic stop and gaining access to the car during the stop, is not consistent with having probable cause to conduct a stop and search of a vehicle. Had agents thought they had probable cause, they simply would have stopped the vehicle and searched it." (Supp. Mem. 5).

Irrespective of whether the information acquired by Troopers Lamm and Clark during the stop established probable cause to search, the information clearly did provide the reasonable suspicion necessary to justify the exterior sniff of the vehicle by the narcotics detection canine. The resulting positive alert of the canine, standing alone, provided probable cause to search the vehicle for drugs. *See United States v. Branch*, 537 F.3d 328, 340 n.2 (4th Cir. 2008) ("[I]t is "well settled that a 'positive alert' from a drug detection dog, in and of itself, provides probable cause to search a vehicle." (citing *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994))).

The court also rejects defendant's contention that Troopers Lamm and Clark had no lawful basis for the continued detention of defendant and Jett following completion of the traffic enforcement portion of the stop. The Fourth Circuit has made clear that "[t]he driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). As already discussed, Troopers Lamm and Clark had the probable cause necessary to justify extension of the stop. But, in addition, Jett consented to extension of the stop when he agreed to answer Trooper Lamm's additional questions. *See United States v. Williams*, No. 1:12-CR-00264-1, 2013 WL 1435199, at *13 (M.D.N.C. 9 Apr. 2013) ("A consensual conversation between an officer and a citizen at the end of a traffic stop does not run afoul of the Fourth Amendment's protections."); *see also United States v. Farrior,* 535 F.3d 210, 218 (4th Cir. 2008) (holding that "the end of the traffic stop did not signal the beginning of an unconstitutional seizure" where the driver "voluntarily responded to the questions [of the officer] in what appears from the record to have been a completely consensual exchange").

Moreover, the total length of time that the traffic stop was extended before Trooper Lamm conducted the exterior sniff was approximately five minutes. The circumstances of this

case clearly justified this brief extension of the stop to confirm Troopers Lamm's and Clark's suspicions that the vehicle contained marijuana. *See, e.g, United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010) (holding that "[t]he one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern" and noting that "on numerous occasions, we have approved longer stops against challenges of unreasonable delay" (collecting cases)). Following the positive alert by the narcotics detection canine, further continuation of the stop was justified by the probable cause to search the vehicle for drugs.

For the foregoing reasons, the court concludes that Troopers Lamm and Clark had sufficient probable cause to search the vehicle. Therefore, defendant's motion to suppress the evidence seized during the vehicle search as well as his post-arrest statements should be denied.

## II.     DEFENDANT'S CONSENT TO A SEARCH OF HIS HOME

An exception to the prohibition against warrantless searches is "where valid consent to the search is given." *United States v. Digiovanni*, 650 F.3d 498, 513 (4th Cir. 2011) (citing *Schneckloth*, 412 U.S. at 219. "'Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent.'" *Id.* (quoting *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citations and internal quotation marks omitted)). The question whether an individual's consent to search was voluntary "is to be determined by the totality of all the circumstances." *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). The government must establish the validity of the consent to search by a preponderance of the evidence. *Digiovanni*, 650 F.3d at 513-14.

Defendant contends that the purported consent he gave to the FBI to conduct a search of his home was not valid for two reasons. First, he contends that the unlawfulness of the vehicle

search tainted his consent such that it was not "sufficiently an act of free will to break the causal chain of events flowing from the highway patrolmen's initial constitutional violation in searching the car" (Mot. 14). *See, e.g., United States v. Hill*, 649 F.3d 258, 268 (4th Cir. 2011) (holding that the government bears the burden of showing that any taint from an unlawful search is dissipated by a subsequently obtained consent). However, because the court has concluded that the search of the vehicle was lawful, defendant's challenge on this ground fails.

Defendant's second basis for challenging the voluntariness of his consent is that it was the product of coercion by law enforcement. Specifically, he contends that the Agents, knowing how much he cared for the pets living in the home, suggested to him that if he did not provide consent for the search, such that a search warrant had to be obtained, the safety of his pets would be at risk. There is no evidence to support defendant's contention.

The evidence of defendant's consent consists of a "Consent to Search" form signed by him clearly showing that he gave the Agents his permission to search his home, which was identified by his home address. (Inter. Rep. 3). Regarding the exchange that occurred between defendant and the Agents about consent to search, Agent Noyes testified that after asking for consent to search, defendant responded by asking questions about "what it would mean, what it would entail, why we needed to do [the search]." (Tr. 43:15-22). Agent Noyes described the discussion more specifically as follows:

> His questions, he asked if he could go with us, he asked if he could be there when it happened. He had brought up at that point and other times during the interview his animals that were there. He had two very large dogs that lived there, he had I believe 15 cats and two snakes that were living there. He talked about those animals being there. He asked if he could go there and feed them and be with them, and we said yes, you know, as part of a consent search, yes, you would go with us and you'd be there.

(Tr. 44:1-9). There is simply nothing in this exchange that would indicate that the Agents exploited the presence of pets in the home to garner defendant's consent. It reflects only the Agents' response to a concern raised by defendant himself.

Not only is there no evidence of coercion as alleged by defendant, the circumstances otherwise indicate that defendant's consent was wholly voluntary. At the time he gave his consent, defendant had already admitted to the Agents that he had a shotgun in his home and told Agents precisely where it was located. Further indication that defendant was not being improperly pressured or influenced by the Agents is that, while consenting to the search of his home, he nevertheless exercised his right to refuse to consent to a search of his computer and phone. Accordingly, the court concludes that defendant's challenge to the search of his home is without merit.

## CONCLUSION

For the foregoing reasons, it is therefore RECOMMENDED that defendant's motion to suppress (D.E. 22) be denied.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on the respective parties or, if represented, their counsel. Each party shall have until 17 August 2015 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Any response to objections shall be filed within 14 days after service of the objections on the responding party.

SO ORDERED, this 3rd day of August 2015.

James E. Gates
United States Magistrate Judge